# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No.

ALEXANDER RIST, Derivatively On Behalf of STARTEK, INC.,

      Plaintiff,

vs.

A. EMMET STEPHENSON, JR.,
WILLIAM E. MEADE, JR.,
MICHAEL W. MORGAN,
EUGENE L. MCKENZIE, JR.,
PAMELA S. OLIVER,
TONI E. STEPHENSON,
ED ZSCHAU,
HANK BROWN,
MICHAEL S. SHANNON,
KAY NORTON,
ALBERT C. YATES
and LAWRENCE ZINGALE

      Defendants,

- and -

STARTEK, INC., a Delaware corporation,

      Nominal Defendant.

---

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT AND DEMAND FOR JURY TRIAL

    Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

### NATURE OF THE ACTION

    1.    This is a shareholder derivative action brought by a shareholder of StarTek, Inc. ("StarTek" or the "Company"), on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state law, including breaches of fiduciary duties, abuse

of control, gross mismanagement, waste of corporate assets and unjust enrichment that occurred between August 2002 and the present (the "Relevant Period") and that have caused substantial losses to StarTek and other damages, such as to its reputation and goodwill.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a)(2) in that plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interests and costs.

3.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with Colorado so as to render the exercise of jurisdiction by the Colorado courts permissible under traditional notions of fair play and substantial justice.

4.     Venue is proper in this Court because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to StarTek occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## SUMMARY OF THE ACTION

5.     StarTek provides global "state-of-the-industry" process outsourcing services. Defendants named herein are A. Emmet Stephenson, Jr. ("Stephenson"), co-founder and Chairman of the Board of the Company, his wife Toni E. Stephenson ("T. Stephenson"), his sister Pamela S. Oliver ("Oliver") (who together beneficially owned approximately 66.3% of the stock of the Company, elected the entire Board of Directors and controlled the Company), Michael W. Morgan ("Morgan"), the other co-founder and Vice Chairman of the Board, William E. Meade, Jr.

("Meade"), the former Chief Executive Officer ("CEO"), Eugene L. McKenzie, Jr. ("McKenzie"), the Chief Financial Officer ("CFO") of the Company, Lawrence Zingale ("Zingale"), directors Ed Zschau ("Zschau"), Kay Norton ("Norton"), Albert C. Yates ("Yates") and former directors Hank Brown ("Brown") and Michael S. Shannon ("Shannon").

6.      In 2002, StarTek's value was down considerably from a 2000 high of $74 per share following a sluggish economy as a result of September 11, 2001 and later Company personnel changes.  In order to artificially inflate StarTek's value, defendants began to issue highly positive statements concerning existing demand for its services and the sales pipeline for new contracts.  On November 6, 2001, Stephenson said in a press release, "We do not consider the overall results of the third quarter to be indicative of trends for the fourth quarter since current activity seems to be returning to patterns seen in the second quarter as we move away from September 11.  Our focus is now on taking advantage of opportunities we see for profit growth in 2002."  As revenues began to improve, on November 7, 2002, Stephenson said in a press release, "We are pleased with the third quarter results which reflect continuing growth in our business.  *Revenue growth is following the company's historical revenue pattern*."  In order to paint a picture of prosperity and future growth for StarTek to match the Company's "historical revenue pattern," defendants had to make good on their forecasts of growth in 2003.  Therefore, defendants continued to open facilities where demand had yet to materialize.

7.      In February 2003, Stephenson, his wife (T. Stephenson) and sister (Oliver, who was the sole trustee of the FASSET and MASSET Trusts, with sole voting power and investment power) beneficially owned approximately 66.3% of the common stock of the Company.  In February 2004 T. Stephenson and Oliver proposed to sell over 3.6 million shares of personally held or controlled Company stock.  According to the April 2004 Company Proxy, even after this public offering benefiting only the Stephenson family, with no money going to StarTek, Stephenson, his wife and sister were able to elect the entire Board of Directors (the "Board"), control substantially all other

matters requiring action by the Company's stockholders and dominate and control the Board's actions related to the Company.  Together Stephenson and his family collectively sold over $147 million in Company stock between January 2004 and June 2004.

8.　　On February 26, 2003, Stephenson said in a press release: "This month we have announced the opening of two new facilities . . . to handle growing demand for our superior outsourced services.  Although expenses will increase this quarter related to the start up of these operations, the demand for this additional capacity brightens the outlook for more growth in future quarters."  StarTek's value increased over 4% because of these positive public statements regarding new facilities in response to strong existing demand.  In fact, defendants further painted a rosy picture by causing or allowing StarTek to publicly state that the Company "leveraged capacity very, very effectively, *we're not in a*, *you know*, *we will build and hope they come type of environment. . . . [B]ecause of our conservative nature . . . you could be pretty much assured that somewhere right behind that there is a client in the pipeline. So that's the best leading indicator of our capacity and how the capacity relates to growth*."

9.　　StarTek, however, opened new facilities not to service existing demand for current customers, but in the vain hope that demand would materialize in the future.  Defendants knew or should have known that there was not sufficient future demand to fully utilize these new facilities because StarTek's customers were contractually obligated to provide a twelve month, rolling call volume forecast, and a monthly daily call volume forecast.  At the same time, Stephenson announced that two new facilities were now open and "we are happy to report that both came in on time and within budget. Currently, our revenue is growing at the new facilities, and we expect the increase will continue to ramp over the coming quarters. At full capacity, these two facilities would employ 1,400 people.  Overall, we see business conditions gradually improving for our company as they have for the last 7 quarters in a row."  Defendants' highly positive public statements artificially inflated StarTek's value over 5.5%.  Defendants later admitted on March 3, 2005: "We launched

three new call centers in anticipation of a lot greater volume, with a couple of the clients that we signed last year.  That didn't materialize last year . . . ."  Nonetheless, StarTek value steadily rose from a February 2003 value of slightly over $20 to an August 2003 value of over $36.  Defendants took advantage of this artificial inflation and unloaded 95,800 shares of StarTek stock between August 19, 2003 and September 17, 2003, reaping over $3.4 million in insider trading proceeds.

10.     Subsequently, in October 2003, defendants continued to represent that StarTek had opened several new telecommunication facilities to meet increased demands.  Shortly thereafter, defendants said that "[d]emand for these services now appears to be larger than we previously expected, which requires opening a fourth new facility this year to keep up."  In response to this statement, StarTek's value rose over 3.6%.  Stephenson said that "StarTek's business grew significantly during the September quarter as previously opened facilities ramped up on time and within budget."  Business was so good that Stephenson exclaimed that StarTek was "opening two more facilities that will ultimately employ nearly 1,000 additional new employees when fully staffed in 2004.  Currently, we expect next year to offer opportunity for growth in our technical support and business process management services platforms, and we will be fully prepared to capture that additional growth."  The market again reacted positively.  StarTek's value again climbed 5.5% and continued to rise thereafter on the basis of representations regarding StarTek's financial prospects and condition.

11.     In early 2004, rumors began circulating that Cingular was planning to acquire StarTek's biggest client, AT&T Wireless ("AWE"), which accounted for 38% of StarTek's revenue.  If Cingular took over AWE, in accordance with certain contractual provisions, Cingular would be free to cancel AWE's contract with StarTek.  As one analyst put it, since Cingular was not a client of StarTek "we believe it is relatively possible that [StarTek] could lose up to 40% of its revenue base by the end of 1Q05."

12.     The possible loss of the AWE contract, compounded by significant amounts of excess capacity resulting from the opening of four new facilities and demand shortage, posed a threat to the value of StarTek and to the Individual Defendants who owned significant amounts of StarTek stock. StarTek's insiders knew that if these negative conditions continued or worsened, they would have a very adverse impact on StarTek's growth and profitability and when these adverse trends became publicly known would cause StarTek's stock to decline. Thus, in order to capitalize on StarTek's artificially inflated value, defendants would have to dump a high volume of shares. However, defendants could not just sell the volume of shares in the open market, without obvious violations of securities laws. For example, restrictions existed under Securities and Exchange Commission ("SEC") Rule 144, which sharply limited the number of "unregistered" shares StarTek's insiders could sell into the open market. Further, if StarTek's top insiders started to sell off a large portion of their StarTek holdings, then StarTek's value would decline, limiting their windfall.

13.     Defendants decided to undertake a large SEC-registered public offering of millions of shares of StarTek stock to enable themselves to sell off larger amounts of their own Company stock than they could legally sell via open market sales of unrestricted shares under SEC Rule 144. In a registered secondary offering, StarTek's insiders could sell shares without the Rule 144 volume restrictions, especially through underwriters, which would stabilize the market trading price of StarTek stock. Defendants conditioned the market for the stock offering by issuing very positive reports and forecasts pushing the stock up to higher levels, including making roadshow presentations just before the public offering to disseminate very favorable information to create demand for the stock.

14.     On February 17, 2004, StarTek filed a Registration Statement for a public stock offering of 3.2 million shares at a proposed maximum price of $39.82 per share and a proposed maximum aggregate value of $146.5 million to be received by the selling shareholders. The market responded favorably to defendants' representations in the Registration Statement. For example, in

the Registration Statement, defendants represented that "[f]or our capacity deployment strategy, we seek to maintain enough available capacity to meet our clients' sudden surges in demand while maintaining high capacity utilization levels throughout our organization." This statement, however, was improper because StarTek did not have high utilization rates. It was later revealed that the Company had a tremendous amount of excess capacity due to the fact that defendants opened four new facilities without any actual business prospects or corresponding demand.

15.     After StarTek filed its Registration Statement with the SEC, Cingular announced that it was acquiring AWE. Cingular's announcement jeopardized StarTek's public offering. As one analyst wrote: "AT&T Wireless (AWE) represents about 35% of [StarTek]'s revenue. We believe the proposed AT&T Wireless /Cingular merger could therefore have a potentially significant impact on [StarTek]'s revenue and earnings in 2005 and beyond . . . . With the acquisition of AWE, Cingular may choose to bring the AWE call center work inhouse, and consolidate it with its existing internal infrastructure." In response to the merger announcement, StarTek stock declined from $42.05 on February 17, 2004, to $ 37.62 on February 23, 2004. It was doubtful that defendants would be able to successfully complete the public offering, and on March 19, 2004, StarTek announced that the "offering of 3.2 million shares expected to price Thursday via Lehman Brothers Inc. was postponed due to market conditions."

16.     In order to salvage the public offering and complete substantial insider sales, StarTek renegotiated its contract with AWE. In a revised S-3 filed on April 13, 2004, StarTek told investors that its contract with AWE was extended until December 31, 2006, and was not subject to termination for convenience or without cause. Analysts told the market that "the AWE/Cingular merger created uncertainty about the future of [StarTek]'s relationship with its largest client that negatively impacted the stock over the past few weeks. We think that this contract extension significantly mitigates this risk." But the revised Registration Statement and all of defendants' statements concerning the new contract with AWE were improper because defendants didn't disclose

that StarTek was forced to desperately lower its pricing in return for the contract extension. Later, in StarTek's 2004 annual report filed on Form 10-K, defendants admitted that "[o]ur cost of services as a percentage of revenue increased primarily due to underutilized capacity associated with lower than forecasted volumes and the tiered pricing structure set in place by our agreement with Cingular [AWE], which results in decreased revenue rate at higher levels of volume."

17.     Lehman Brothers was originally the lead underwriter for the public offering, but after conducting a due diligence investigation in which it discovered the terms of the new contract with AWE, Lehman Brothers withdrew from the offering.

18.     Then, on June 10, 2004, StarTek announced the pricing of a public offering of 3.8 million shares of common stock at $33.00 per share by three of its stockholders, with over 3 million of those shares were offered by T. Stephenson and Oliver (Stephenson's family members). The press release noted that the selling stockholders increased the offering by 600,000 shares from their 3.2 million share offering announced February 17, 2004, and that *the Company would receive no proceeds from the sale of the common stock*. The press release did not mention that Lehman Brothers withdrew from the offering.

19.     On July 29, 2004, defendants continued to disseminate more improper public statements. In a conference call, defendant Meade exclaimed that "[w]e continue to be encouraged by the activity in our sales pipeline. As I stated, we are currently in the middle of ramping two new clients which were secured earlier this year. We are encouraged by our recent close rates and the size of our sales pipeline. We anticipate replicating the success we had during the first half of 2004 with two new key client acquisitions during the second half of 2004, and we are very pleased with the ongoing positive response from both our existing clients and our newer clients and that they continue to reward us with more of their business." Analyst repeated these representations stating that *"[m]anagement has characterized the current pipeline as among the healthiest ever."* In reality, the sales pipeline was weak and the sales force was relatively new and untrained. On March

3, 2005, defendants admitted that StarTek was forced to hire another new head of sales in October 2004 who completely revamped the sales force during the course of the fourth quarter, and during January 2005.  And at the end of the Relevant Period, defendants admitted that "the sales team that's in place today is still fairly new.  Most of them came on board November, December, January time frame."

20.     Then, two months after the upbeat July 29, 2004 conference call, StarTek filed an 8-K with the SEC on October 4, 2004, which stated that on October 1, 2004, defendant McKenzie had resigned as Executive Vice President, Chief Financial Officer, Secretary and Treasurer for "personal reasons."

21.     In November 2004, StarTek held a conference call for analysts, money and portfolio managers, institutional investors and large StarTek shareholders.  During the call, defendant Meade stated: "Now we could have made staff reductions, but because of our optimism and confidence in both the near term and the mid term in reality our visibility in the solid demand for incremental seats during the late third quarter and also moving into the fourth quarter, . . our assessment was not to make cuts." He also reiterated that ***"the pipeline is the strongest its been since I've been CEO which is 3 plus years, and we feel good about the incremental revenue that will be coming from new signings."***

22.     In January 2005, StarTek's value declined 11% as information that StarTek's fourth quarter would be weak and that the Company's sales pipeline was not as strong as investors were led to believe began to leak into the market.  Defendants denied that there were any problems at the Company.  As one analyst report noted: "Management last night confirmed that there was [sic] no new occurrences announced either by the company or from client-related actions.  [StarTek] was down 11% in the past three days on no news, declining 7% yesterday on twice normal volume." The report explained that:

> [t]he stock weakness may primarily reflect three investor concerns: (1) that 4Q will be weaker than expected; (2) that [StarTek] was not able to secure the 3 RFPs [Request for Proposals] in the 4Q pipeline; and/or (3) that [StarTek] will not be able

to offset a potential decline in AWE revenue and meet '05 Street estimates & dividend payments.

23.     After continually representing a positive future for StarTek's financial projects, on February 18, 2005, StarTek issued a press release entitled "StarTek, Inc. Announces Management Change," which stated that defendant Meade had resigned as President and CEO of the Company. StarTek's value dropped almost 24% as the truth continued to emerge.

24.     Then on March 3, 2005, StarTek disclosed that "[f]ully diluted earnings per share including discontinued operations decreased by 44% to $0.30, compared to $0.54 for the same period in 2003.  The gross margin decline of 9.7% points from 29.7% to 20.0%, was largely the result of greater costs from the launching of new call center capacity to handle anticipated volume growth that materialized at lower levels than our clients forecasted, continuing decreases in revenue and margins in our supply chain management platform, and increased volume billed at lower agent rates due to our tiered incentive pricing model."  In addition, StarTek held a conference call where Steven Butler, the Company's new CFO and acting CEO, admitted that "***We launched three new call centers in anticipation of a lot greater volume, with a couple of the clients that we signed last year. That didn't materialize last year*** . . . ."  Then Troy Mastin an analyst with William Blair & Co. asked "***And then on the new business pipeline, there has been a lot of discussion over the last 6-9 months that it was healthy. It's characterized as the strongest ever***.  You didn't mention any new clients on the call, can you give us up [sic] an update on any landed in the quarter, and what the pipeline looks [like] today in your assessment?"  In response, Butler disclosed for the first time that StarTek "hired a new head of sales in October, who completely revamped the sales force during the course of the fourth quarter, and during the course of January.  ***I cannot announce any clients today***."  After this news StarTek's value continued to fall drastically.

25.     Finally, on May 6, 2005, StarTek announced that its first quarter 2005 "earnings per share from continuing operations decreased . . . to $0.18 compared to $0.49 for the first quarter of 2004."  The Company also announced that its revenues declined 14.2% from the same period in

2004. Subsequent to the release of its quarterly results, StarTek stated in a conference call that "[i]n looking at gross profit, our total gross profit for the first quarter of '05 compared to the first quarter of '04 fell 35% or $6.4 million to 11.7 million." The "tiered pricing incentives and reduced supply chain volume accounted for approximately $4 million of this change." In reality, StarTek's revenues declined because StarTek was forced to notably reduce its pricing in return for the contract extension with AWE. Defendants also admitted that "[t]he sales team that's in place today is still fairly new." StarTek's value fell yet again, just over 18%.

## THE PARTIES

26.     Plaintiff Alexander Rist is, and was at times relevant hereto, an owner and holder of StarTek common stock. Plaintiff is a citizen of Washington.

27.     Nominal defendant StarTek is a corporation organized and existing under the laws of the state of Delaware with its headquarters located at 100 Garfield Street, Denver, Colorado 80206. StarTek is a provider of business process outsourced services, which consist of business process management and supply chain management services. The Company's business process management services include provisioning management, wireless telephone number porting, receivables management, wireless telephone activations, and high-end technical support and customer care services. The supply chain management services include packaging, fulfillment, marketing support and logistics services.

28.     Defendant Stephenson co-founded StarTek in 1987 and is, and at all times relevant hereto was, Chairman of the Board of StarTek. Defendant Stephenson has maintained this position since the Company's formation in 1987. Because of Stephenson's position, he knew the adverse, non-public information about the business of StarTek, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof and via reports and other information provided to him in

connection therewith.  During the Relevant Period, Stephenson participated in the issuance of improper statements, including the preparation of the improper press releases.  For FY:03 and FY:04, StarTek paid defendant Stephenson $245,000 in compensation.  During the Relevant Period, Stephenson caused his wife, defendant T. Stephenson, himself and his sister defendant Oliver to sell 43.4% of the Company's stock based on inside information, which collectively represented over 65% of the Stephenson family controlled holdings.  Defendant Stephenson still retains a controlling 22% of StarTek stock.  Defendant Stephenson is a citizen of Colorado.

29.     Defendant Morgan co-founded StarTek in 1987 and served as Vice Chairman of the Board of StarTek all times relevant hereto until approximately May 2004.  Because of Morgan's position, he knew the adverse, non-public information about the business of StarTek, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Morgan participated in the issuance of improper statements, including the preparation of improper press releases.  For FY:03, StarTek paid defendant Morgan $270,800 in salary.  Morgan sold 142,600 shares of StarTek stock for proceeds of $5,095,894.  Defendant Morgan is a citizen of Colorado.

30.     Defendant T. Stephenson is the wife of defendant Stephenson.  From the inception of StarPak, Inc. and StarPak International, Ltd. until January 23, 1997, T. Stephenson was a director of StarPak, Inc. and StarPak International, Ltd. and continued to act as a vice president of such companies, without compensation.  Because of T. Stephenson's prior Company associations and personal relationship with defendant Stephenson, with respect to the knowledge privy to defendant Stephenson during the Relevant Period, she knew the adverse, non-public information about the business of StarTek, as well as its finances, markets and present and future business prospects, via defendant Stephenson's access to internal corporate documents, conversations and connections with

other corporate officers, Stephenson, and other employees, and via other information provided to her in connection therewith.  During the Relevant Period, T. Stephenson sold 2,383,076 shares of StarTek stock for proceeds of $78,641,508.  T. Stephenson is a citizen of Colorado.

31.     Defendant Oliver is the sole trustee of the FASSET Trust and MASSET Trust and has sole voting power and investment power with respect to the common stock held by the trusts.  From the inception of StarPak, Inc. and StarPak International, Ltd. until January 23, 1997, defendant Oliver was a director of each such company, and continued to act as a vice president of StarPak, Inc. and StarPak International, without compensation.  Oliver is also defendant Stephenson's sister.  Because of Oliver's prior Company associations and personal relationship with defendant Stephenson, with respect to the knowledge privy to defendant Stephenson during the Relevant Period, she knew the adverse, non-public information about the business of StarTek, as well as its finances, markets and present and future business prospects, via defendant Stephenson's access to internal corporate documents, conversations and connections with other corporate officers, Stephenson, and other employees, and via other information provided to her in connection therewith.  During the Relevant Period, the FASSET Trust sold 1,027,262 shares of StarTek stock for proceeds of $34,196,950, and the MASSET Trust sold 1,027,262 shares of StarTek stock for proceeds of $34,177,375.  Defendant Oliver is a citizen of Colorado.

32.     Defendant Meade was the President, CEO and a director of StarTek until his resignation in February 2005.  Because of Meade's positions, he knew the adverse, non-public information about the business of StarTek, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Meade participated in the issuance of improper statements, including the preparation of improper press releases.  For FY:03 and FY:04, StarTek paid defendant

Meade $473,935 and $444,870, respectively, in salary, bonus and other compensation. During the Relevant Period, Meade sold 15,000 shares of StarTek stock for proceeds of $570, 667. Defendant Meade is a citizen of Colorado.

33.     Defendant McKenzie was the Executive Vice President, CFO, Secretary and Treasurer of StarTek until his resignation in October 2004. Because of McKenzie's positions, he knew the adverse, non-public information about the business of StarTek, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, McKenzie participated in the issuance of improper statements, including the preparation of improper press releases. For FY:03 and FY:04, StarTek paid defendant McKenzie $164,287 and $191,154, respectively, in salary and bonus. Defendant McKenzie is citizen of Colorado.

34.     Defendant Zingale was Executive Vice President and Chief Operating Officer of StarTek at times relevant hereto until his resignation on September 30, 2005. Because of Zingale's positions, he knew the adverse, non-public information about the business of StarTek, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Zingale participated in the issuance of improper statements, including the preparation of improper press releases. Defendant Zingale is a citizen of Colorado.

35.     Defendant Brown was a director of StarTek at all times relevant hereto until approximately May 2005. Because of Brown's position, he knew the adverse, non-public information about the business of StarTek, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with

other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Brown participated in the issuance of improper statements, including the preparation of improper press releases. During the Relevant Period, Brown sold 10,000 shares of StarTek stock for proceeds of $358,031.95. Defendant Brown is a citizen of Colorado.

36. Defendant Shannon at was a director of StarTek all times relevant hereto until approximately May 2005. Because of Shannon's position, he knew the adverse, non-public information about the business of StarTek, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Shannon participated in the issuance of improper statements, including the preparation of improper press releases. Defendant Shannon is a citizen of California.

37. Defendant Zschau is, and at all times relevant hereto was, a director of StarTek. Zschau was appointed Vice Chairman of StarTek in December 2004. Because of Zschau's position, he knew the adverse, non-public information about the business of StarTek, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Zschau participated in the issuance of improper statements, including the preparation of improper press releases. Defendant Zschau is a citizen of California.

38. Defendant Norton is a director of StarTek and has been since September 2004. Because of Norton's position, she knew the adverse, non-public information about the business of StarTek, as well as its finances, markets and present and future business prospects, via access to

internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other information provided to her in connection therewith.  During the Relevant Period, Norton participated in the issuance of improper statements, including the preparation of improper press releases.  Defendant Norton is a citizen of Colorado.

39.    Defendant Yates is a director of StarTek and has been since September 2004. Because of Yates' position, he knew the adverse, non-public information about the business of StarTek, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Yates participated in the issuance of improper statements, including the preparation of improper press releases.  Defendant Yates is a citizen of Colorado.

40.    The defendants identified in ¶¶28-29, 32, 35-39 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶28-29, 32-34 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶29-32, 35 are referred to herein as the "Insider Selling Defendants."  Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

41.    By reason of their positions as officers, directors and/or fiduciaries of StarTek and because of their ability to control the business and corporate affairs of StarTek, the Individual Defendants owed StarTek and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage StarTek in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in

furtherance of the best interests of StarTek and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

42.     Each director and officer of the Company owes to StarTek and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

43.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of StarTek, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with StarTek, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations and improper representations of StarTek.

44.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of StarTek, and was at all times acting within the course and scope of such agency.

45.     To discharge their duties, the officers and directors of StarTek were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of StarTek were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)     conduct the affairs of the Company in an efficient, business like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial projections would be true and accurate at all times;

(e)     remain informed as to how StarTek conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

46.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of StarTek, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of StarTek's Board during the Relevant Period.

47.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to disseminate improper statements regarding its financial prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions.  In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action law suits that allege violations of federal securities laws.  As a result, StarTek has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)     Costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(b)     Costs incurred in investigating and defending StarTek and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

48.     Moreover, these actions have irreparably damaged StarTek's corporate image and goodwill.  For at least the foreseeable future, StarTek will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that StarTek's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

49.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the

wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

50.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) maintain the Individual Defendants' executive and directorial positions at StarTek and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions and (ii) deceive the investing public, including shareholders of StarTek, regarding the Individual Defendants' management of StarTek's operations, the Company's financial health and stability, and future business prospects, specifically related to the improper statements by defendants throughout the Relevant Period.  In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

51.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least August 2002 and continuing thereafter.  During this time the Individual Defendants caused the Company to disseminate improper public statements regarding StarTek's future business prospects, as alleged herein.

52.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of StarTek common stock so they could: (i) dispose of over $153 million of their personally held and/or controlled stock; (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof; and (iii) allow other defendants the opportunity to dispose of stock for vast profits, utilizing confidential Company information.

53.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently disseminate improper statements regarding its financial prospects.  Because the actions described herein occurred under the authority of the Board of Directors, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

54.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## IMPROPER STATEMENTS

55.     The Individual Defendants by their fiduciary duties of care, good faith and loyalty owed a duty to StarTek to insure that the Company's public statements fairly represented, in all material respects, the Company's financial future and information concerning business prospects, including significant business contracts, which are the most important aspects of StarTek's business, as well as all other issues material to the Company's operations.  In order to adequately carry out these duties, it is necessary for the Individual Defendants to know and understand the material non-public information to be either disclosed or omitted from the Company's public statements. Defendants Zschau, Yates, Brown, Shannon and Norton were, during part of the Relevant Period, members of the Audit Committee, which is responsible for reviewing and discussing the Company's earnings press releases as well as the types of financial information periodically provided to analysts and rating agencies.  Defendants Stephenson, Morgan, McKenzie, Zingale and Meade, as officers of StarTek, had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports.  Moreover, defendants

Stephenson, Zschau, Morgan, Meade, Brown, Shannon, Norton and Yates, as directors of StarTek had ample opportunity to discuss this material information with management and fellow directors at any of the approximately 19 Board meetings that occurred during the Relevant Period as well as at meetings of committees of the Board. Despite these duties, the Individual Defendants negligently, recklessly and/or intentionally caused or allowed, by their actions or inactions, the following improper statements to be disseminated by StarTek to the investing public and the Company's shareholders during the Relevant Period.

56.     On August 7, 2002, the Individual Defendants caused or allowed StarTek to issue a press release entitled "StarTek, Inc. Reports EPS Up 12% for Second Quarter," which stated in part:

> StarTek, Inc. today reported results for the second quarter ended June 30, 2002. Net income for the second quarter was $4.0 million, or $0.28 earnings per fully diluted share, compared to $3.6 million, or $0.25 earnings per fully diluted share in the second quarter of 2001, an increase of 12%. Revenues for the second quarter were $43.3 million, compared to $42.3 million for the same quarter in 2001.
>
> For the six months ended June 30, 2002, net income was $8.0 million, or $0.56 earnings per fully diluted share, compared to $4.6 million, or $0.33 earnings per fully diluted share in the same period last year. For the first six months of 2002, revenues were $89.3 million compared to $74.8 million for the same period last year, an increase of 19%. In the six months ended June 30, 2001, the company recognized a loss on an impaired investment of $3.1 million ($1.9 million after tax); excluding that charge, net income would have been $6.5 million, or $0.46 earnings per fully diluted share.
>
> Chairman A. Emmet Stephenson, Jr. said, "We are relatively satisfied with our growth on the bottom line this quarter, because we are comparing with the best quarter last year when our business benefited from a major project from a large customer. *We have recently penetrated the consumer products vertical market, therefore our client base is both expanding and diversifying as a result of our marketing initiatives.* Operationally, our new management team is in place, properly transitioned, and getting up to speed quickly. The overall environment for the last few quarters has been best described as bumping along a rising bottom, which is not a bad way to characterize what we are currently experiencing."

57.     On November 7, 2002, the Individual Defendants caused or allowed StarTek to issue a press release entitled "StarTek, Inc. Reports EPS Up 63% for Third Quarter," which stated in part:

> StarTek, Inc. reports that fully diluted earnings per share increased 63% to $0.31 for the third quarter ended September 30, 2002, from $0.19 last year. Net income increased 67% to $4.5 million from $2.7 million, and revenue grew 21% to $52.1 million this quarter compared to $42.9 million for the same quarter in 2001.

For the nine months ended September 30, 2002, net income was up 71% to $12.5 million, or $0.87 earnings per fully diluted share, compared to $7.3 million, or $0.51 earnings per fully diluted share in the same period last year. For the first nine months of 2002, revenue increased 20% to $141.4 million compared to $117.7 million for the same period last year. After adjustments to exclude a charge for impairment to an investment, net income would have been $9.1 million, or $0.65 earnings per fully diluted share for the first three quarters of 2001.

Chairman A. Emmet Stephenson, Jr. said, "*We are pleased with the third quarter results which reflect continuing growth in our business. Revenue growth is following the company's historical revenue pattern*, as opposed to the roller coaster quarters of 2001. Profit margins continue to improve because of our focus on improving productivity, appropriate cost controls, and a better mix of business. Trends evident today seem favorable for improved profitability as we move into the fourth quarter."

58.     In order to continue with the "historical revenue pattern," it was necessary for defendants to cause StarTek to open facilities where demand had yet to materialize.  On February 4, 2003, the Individual Defendants caused or allowed StarTek to issue a press release entitled "StarTek Opens Its 16th Facility; Locates 500-Seat Center in Regina, Saskatchewan," which stated in part:

StarTek, Inc., an international provider of outsourced services, today announced plans to open a 500-seat technical support and customer care center in Regina, Saskatchewan, to support its growing teleservices business. The Company will hire approximately 800 employees for this site, which is located in a 62,000 square foot facility in the Cornwall Center Office Complex. By May 2003, StarTek expects to be fully operational.

A. Emmet Stephenson, Jr., Chairman of the Board of StarTek stated:

"We are excited about the opportunities for expansion in the Province of Saskatchewan. *This is the fourth facility that we have opened in Canada in the last two years and reflects the demand for StarTek's higher, value added services and our continued penetration of the outsourced services market* with the most flexible, cost effective business process services now available."

Bill Meade, StarTek's CEO commented: "We are delighted to open our 16th facility in Regina, Saskatchewan.  Regina offers StarTek a large pool of well-educated and motivated people who can help us provide the service excellence for which we are known.  We owe a special thanks to Mayor Pat Fiacco of the City of Regina, Bryon Burnett of the Regina Economic Authority, and Darlene Hincks of the Saskatchewan Ministry of Industry and Resources for their invaluable support and cooperation, and we look forward to becoming a vital and contributing member of the Saskatchewan community."

59.     On February 24, 2003, the Individual Defendants caused or allowed StarTek to issue a press release entitled "StarTek Opens Its 17th Facility; Locates Technical Support Center in Decatur, Illinois," which stated in part:

> StarTek, Inc. today announced plans to open a technical support center in a 38,000 square foot facility in Decatur, Illinois, to expand its growing teleservices business.
>
> StarTek intends to hire approximately 250 employees and expects to operate 24 hours per day, 7 days per week by next summer.
>
> A. Emmet Stephenson, Jr., Chairman of the Board of StarTek stated, "We are very pleased to announce our first teleservices facility in Illinois. This expansion reflects the continued demand for StarTek's higher value-added services and our penetration of the outsourced services market with the most flexible, cost effective business process services now available."

60.     On February 26, 2003, the Individual Defendants caused or allowed StarTek to issue a press release entitled "StarTek, Inc. Fourth Quarter Earnings Per Share Grow," which stated in part:

> StarTek, Inc. today reported net income for the fourth quarter of $6.5 million, or $0.45 earnings per fully diluted share, excluding a non-cash investment impairment charge, which is up 23% from $5.3 million, or $0.37 earnings per fully diluted share, also excluding an investment impairment charge, in the fourth quarter of 2001. Revenue in the fourth quarter of 2002 was $66.5 million up from $64.9 million in the same quarter last year. . . .
>
> *   *   *
>
> Chairman A. Emmet Stephenson, Jr. said, "We are very pleased with the results of 2002, a year of growth and transition for the company.  In a difficult economic environment, we attained all time record high revenue for StarTek with growth of 14% year-over-year and increased operating profit by 49% over 2001. Both fourth quarter revenue and operating earnings per share were the highest in StarTek's history.  Our margins improved due to a focus on improved productivity and a better mix of services provided.  Our new management team has been in place during this period and deserves full credit for these good results."
>
> "This month we have announced the opening of two new facilities to add 100,000 square feet of call center space to handle growing demand for our superior outsourced services.  Although expenses will increase this quarter related to the start up of these operations, the demand for this additional capacity brightens the outlook for more growth in future quarters."

61.     On May 7, 2003, the Individual Defendants caused or allowed StarTek to issue a press release entitled "StarTek Reports First Quarter Results," which stated in part:

> StarTek, Inc. today reported results for the first quarter ended March 31, 2003.  Net Income was $4.2 million, or $0.29 earnings per fully diluted share, compared to $4.0 million, or $0.28 earnings per fully diluted share in the first quarter of 2002. Revenue in the first quarter of 2003 was $50.5 million, up from $46.0 million in the same quarter last year.
>
> Chairman A. Emmet Stephenson, Jr. said, "As expected, ***our growth in the first quarter was only modest as we concentrate on adding new capacity for identifiable client demand in the second half of the year.  Currently, we are still absorbing start up costs, Including training expense, for the two new facilities, one of which will start generating revenue late this quarter with the second one becoming operational shortly thereafter***.  The year seems to be developing similarly to our historical seasonal pattern, and we expect to be more satisfied with the second half of 2003 than the sluggish first half."

62.     On August 5, 2003, the Individual Defendants caused or allowed StarTek to issue a press release entitled "StarTek, Inc. Initiates Quarterly Cash Dividend and Reports Second Quarter Earnings," which stated in part:

> StarTek, Inc. reports revenue increased 25% for the second quarter to $54.5 million from $43.3 million for the same quarter in 2002. Net income for the second quarter was $4.2 million, or $0.29 earnings per fully diluted share, compared to $4.0 million, or $0.28 earnings per fully diluted share in the second quarter of 2002.
>
> For the six months ended June 30, 2003, revenue was $105.1 million compared to $89.3 million for the same period last year, an increase of 17%. For the first six months of 2003, net income was $8.3 million, or $0.57 earnings per fully diluted share, compared to $8.0 million, or $0.56 earnings per fully diluted share in the same period last year.
>
> *  *  *
>
> Chairman A. Emmet Stephenson, Jr. said, "We are pleased with the increase in our revenue, but as announced in May, we have been absorbing the costs of opening new facilities in Decatur, Illinois, and Regina, Saskatchewan, Canada, over the last few months. Both facilities are now open, and we are happy to report that both came in on time and within budget. Currently, our revenue is growing at the new facilities, and we expect the increase will continue to ramp over the coming quarters. At full capacity, these two facilities would employ 1,400 people. Overall, we see business conditions gradually improving for our company as they have for the last 7 quarters in a row.
>
> "In recognition of the new 15% maximum tax on dividends recently enacted by Congress and signed by President Bush, the StarTek Board has decided to begin returning to stockholders profits earned by the company in the form of a quarterly

cash dividend. The great attraction of StarTek's business model, which is cash generating, self financing, and produces high returns on invested capital, can now manifest itself in dividend payments to our stockholders. In the future the Board will consider the results produced by our company and determine the appropriate cash dividend for each period, while providing funds for the capital expenditures and reinvestment needed to fuel our continued growth."

63.     On October 15, 2003, the Individual Defendants caused or allowed StarTek to issue press releases detailing the opening of three new facilities, including a press release entitled "StarTek, Inc. Announces Opening of 18th Facility," which stated in part:

StarTek, Inc. announced plans to open a 40,000 square foot teleservices facility in Sarnia, Ontario, Canada.  The center will operate 24 hours per day, 7 days per week and will employ over 500 people when fully staffed. The hiring of new associates will commence shortly, and the company expects to be fully operational later this year. *In order to give existing and new clients outstanding service*, *StarTek will fit the building with state-of-the-art telecommunications systems to handle the increased demand from its targeted markets*.

*A. Emmet Stephenson, Jr., Chairman of the Board of StarTek stated,* "*Our decision to open still another facility in Canada in a short period of time reflects our continuing gains in market share in our teleservices platform.  We operate two facilities in Kingston, one each in Cornwall and Regina and are opening our fifth Canadian facility in Sarnia.*"

Bill Meade, StarTek's CEO commented, "We always target communities where there are many educated and motivated people available.  We found this to be the case in recruiting initial associates for our first facility in Kingston, Ontario, and as a result we feel we will have the same success in staffing our fourth Ontario location. . . ."

64.     On November 3, 2003, the Individual Defendants caused or allowed StarTek to issue a press release entitled "Demand for Wireless Number Portability Services Triggers Capacity Addition," which stated in part:

StarTek, Inc. announced plans to open a 42,000 square foot teleservices facility in Alexandria, Louisiana. The center will employ over 420 people when fully staffed and will operate 24 hours per day, 7 days per week. The company has begun adding new associates in order to be operational late this year with the ramp up continuing well into 2004.

A. Emmet Stephenson, Jr., Chairman of the Board of StarTek stated, "The November 24 initiation of Wireless Number Portability is creating a growing need for our market leading service platform. *Demand for these services now appears to be larger than we previously expected*, *which requires opening a fourth new facility this year to keep up*."

65.     On November 5, 2003, the Individual Defendants caused or allowed StarTek to issue a press release entitled "StarTek's Net Income Up 31% in Third Quarter; Quarterly Dividend is Increased to $.37 Per Share," which stated in part:

> StarTek, Inc. is pleased to report that fully diluted earnings per share increased 29% to $0.40 for the third quarter ended September 30, 2003, from $0.31 last year.  Net income increased 31% to $5.9 million from $4.5 million, and revenue grew 15% to $60.0 million this quarter compared to $52.1 million for the same quarter in 2002.
>
> For the nine months ended September 30, 2003, net income was up 14% to $14.2 million, or $0.98 earnings per fully diluted share, compared to $12.5 million, or $0.87 earnings per fully diluted share in the same period last year. For the first nine months of 2003, revenue increased 17% to $165.1 million compared to $141.4 million for the same period last year.
>
> The StarTek Board of Directors is pleased to declare an increase in its quarterly cash dividend to $0.37 per share, payable November 25, 2003, to StarTek holders of record on November 14, 2003. The previous quarter's dividend was $0.36 and was the company's first quarter of cash dividend payments.
>
> Chairman A. Emmet Stephenson, Jr. said, "***StarTek's business grew significantly during the September quarter as previously opened facilities ramped up on time and within budget***.  Our new associates in Decatur and Regina have completed an excellent start up for our clients in those two new locations for which we are most appreciative. ***We are currently opening two more facilities that will ultimately employ nearly 1,000 additional new employees when fully staffed in 2004. Currently, we expect next year to offer opportunity for growth in our technical support and business process management services platforms, and we will be fully prepared to capture that additional growth***.  After considering our capital needs to finance our growing business, the Board has decided to increase our quarterly dividend to share the cash flow from operations with our stockholders.

66.     On February 17, 2004, the Individual Defendants caused or allowed StarTek to file a Registration Statement relating to a proposed public offering of 3.2 million shares of common stock with the SEC offered by the selling stockholders.  The Registration Statement was signed by defendants Meade, McKenzie, Stephenson, Morgan, Zschau, Shannon and Brown.  The selling stockholders granted the underwriters an option to purchase up to 480,000 additional shares for the purpose of covering over-allotments, if any.  The Registration Statement stated:

> A. Emmet Stephenson, Jr., our Chairman of the Board and co-founder, his wife Toni E. Stephenson, and two trusts controlled by Mr. Stephenson's sister own 60.3% of our outstanding common stock currently.  Following this offering, Mr. and Mrs. Stephenson will beneficially own an aggregate of approximately 38.0% of our outstanding common stock, or 34.6% if the underwriters' over-allotment option is

exercised in full. *As a result, Mr. Stephenson and his wife will continue to be our largest stockholders and together may be able to elect our entire Board of Directors and to control substantially all other matters requiring action by our stockholders.*

67.    On February 27, 2004, the Individual Defendants caused or allowed StarTek to issue

a press release entitled "StarTek, Inc. Fourth Quarter EPS Up 20%," which stated:

> StarTek, Inc. today reported net income for the fourth quarter of 2003 of $8.0 million, which is up 22% from $6.5 million, excluding a non-cash investment impairment charge in the fourth quarter of 2002. Fully diluted earnings per share rose 20% to $0.54 from $0.45 last year on more shares outstanding. Revenue in the fourth quarter of 2003 was $66.1 million compared with $66.5 million in the same quarter last year. During the fourth quarter of the prior year, the company recorded an impairment charge of $6.2 million for an "other than temporary" decline on its investment portfolio resulting in net income of $2.7 million, or $0.18 earnings per fully diluted share.
>
> For the year ended December 31, 2003, net income for the year grew 17% to $22.2 million or $1.52 earnings per fully diluted share compared to $19.0 million, or $1.32 earnings per fully diluted share, excluding the investment impairment charge. Revenue increased 11% to $231.2 million for 2003 compared to $207.9 million for last year. Including investment impairment charges of $6.2 million in prior year 2002, net income for the year ended December 31, 2002 was $15.2 million, or $1.05 earnings per fully diluted share.
>
> Chairman A. Emmet Stephenson, Jr. said, "*We are very pleased with the 2003 results, a year of continued growth for StarTek, as revenue, operating income, net income, and earnings per share reached all time record levels for the year. Our margins further improved due to a better mix of services provided and additional productivity gains as a result of our innovative process management. In the fourth quarter, our business process management services were particularly strong which was reflected in both gross margins and operating profits.*"
>
> "*We successfully opened four new facilities last year, which increased capacity significantly, to meet the growing demand for our outsourced services. As the economy has improved, our clients have responded with renewed emphasis on improving service to their customers and reducing costs, both of which lead to increased demand for StarTek's service offerings.*"

68.    On March 19, 2004, *Dow Jones* ran an article entitled "StarTek 3.2M/Shr Offering

Delayed Due to Market Conditions," which stated in part:

> StarTek Inc.'s offering of 3.2 million shares expected to price Thursday via Lehman Brothers Inc. was postponed due to market conditions.

69.    On April 13, 2004, the Individual Defendants caused or allowed StarTek to file

Amendment No. 2 to Form S-3 Registration Statement, which stated in part:

AT&T Wireless Services has announced that it has entered an agreement to be acquired by Cingular Wireless LLC. The term of our agreement with AT&T Wireless Services was recently extended to December 31, 2006 and is not subject to termination for convenience or without cause.

70.     On May 5, 2004, the Individual Defendants caused or allowed StarTek to issue a press release entitled "StarTek, Inc. First Quarter EPS Up 59% on Revenue Increase of 28%; Increased Quarterly Dividend to $0.39," which stated in part:

StarTek, Inc. today reported that fully diluted earnings per share rose 59% to $0.46 for the first quarter of 2004 from $0.29 in the same quarter of last year. Net income was $6.9 million, up 65% compared to $4.2 million in the first quarter of 2003. Revenue in the first quarter of 2004 increased 28% over the same quarter last year, to $64.7 million from $50.5 million.

In addition, the Board of Directors declared an increase in its quarterly cash dividend to $0.39 per share, payable May 24, 2004, to StarTek holders of record on May 11, 2004. The dividend for the 1st quarter of 2004 was $0.38, which was increased from the 4th quarter 2003 dividend of $0.37.

Chairman A. Emmet Stephenson, Jr. said, "*We are very pleased with the results for the first quarter of 2004 in which revenue growth accelerated as we more fully utilized the new Business Process Management Services capacity we added last year. Two of our four new facilities were operational by the beginning of the second quarter of 2003 and a third one for the fourth quarter. The last one opened in November 2003 but is still in the early stages of its ramp. The dedication of our management team and associates to operational excellence, inherent in the StarTek Advantage System, has resulted in improved efficiency and cost effectiveness as reflected in the improvement in gross profit margins*, *operating margins*, *and bottom line results*.

*Our sales efforts have produced our first meaningful client in the utility industry, a new industry vertical market for StarTek. We believe that continued growth in our Business Process Management Services platform and strategic diversification of our client base will considerably reduce the historical seasonality of our stream of revenue and earnings this year and in the future.* Our commitment to achieving client satisfaction keeps us focused on continuous improvement of our ability to deliver superior service to all our clients."

71.     On June 10, 2004, the Individual Defendants caused or allowed StarTek to issue a Prospectus which stated:

|                                                      | Per Share | Total         |
|------------------------------------------------------|-----------|---------------|
| Public offering Price                                | $33.00    | $125,400,000  |
| Underwriting Discounts and Commissions               | $1.65     | $  6,270,000  |
| Proceeds to Selling Stockholders (before expenses)   | $31.35    | $119,130,000  |

\* \* \*

**_Our largest stockholder_, _together with members of his family_, _will own 33.6% of our outstanding shares following this offering and will have the ability to significantly influence major corporate actions_.**

A. Emmet Stephenson, Jr., our Chairman of the Board and co-founder, his wife Toni E. Stephenson, and two trusts controlled by Mr. Stephenson's sister own 59.9% of our outstanding common stock currently. Following this offering, Mr. and Mrs. Stephenson will beneficially own an aggregate of approximately 33.6% of our outstanding common stock, or 29.6% if the underwriters' over-allotment option is exercised in full. As **_a result_, _Mr. Stephenson and his wife will continue to be our largest stockholders and together may be able to elect our entire Board of Directors and to control substantially all other matters requiring action by our stockholders_**. . . .

\* \* \*

- Maintain a Disciplined Approach to Expansion. We plan to grow our revenue organically through staged expansion of the services we provide to our existing or potential clients, or through rapid deployment of capacity to assist our clients in responding to demand for their products or services. For our staged expansion strategy, we seek to obtain new clients or provide new services to existing clients by providing highly competitive pricing. Once engaged to provide a service, we seek to deliver service quality that exceeds our clients' value expectations, which should position us well to expand the scale and profitability of that project. For our capacity deployment strategy, we seek to maintain enough available capacity to meet our clients' sudden surges in demand while maintaining high capacity utilization levels throughout our organization.

\* \* \*

In 2002, AT&T Wireless Services accounted for 26.3% of our revenue, Microsoft Corporation accounted for 34.4%, T-Mobile, 12.2%, and AT&T Corporation, 13.3%. AT&T Wireless Services has announced that it has entered an agreement to be acquired by Cingular Wireless LLC. The term of our agreement with AT&T Wireless Services was recently extended to December 31, 2006 and is not subject to termination for convenience or without cause.

72.    On June 10, 2004, the Individual Defendants caused or allowed StarTek to issue a

press release entitled "StarTek, Inc. Announces Pricing of Common Stock in Public offering by

Selling Stockholders," which stated in part:

StarTek, Inc. today announced the pricing of a public offering of 3,800,000 shares of common stock at $33.00 per share by three of its stockholders. The selling stockholders increased the offering by 600,000 shares from their 3,200,000 share

offering announced Feb. 17, 2004. The Company will receive no proceeds from the sale of the common stock. . . .  The anticipated settlement date is June 15, 2004. SunTrust Robinson Humphrey, is acting as the lead manager and sole book running manager for the deal. William Blair & Company and Thomas Weisel Partners LLC are acting as co-managers.

73.    On July 28, 2004, the Individual Defendants caused or allowed StarTek to issue a press release entitled "StarTek, Inc. Reports Second Quarter Earnings Increase of 52%," which stated in part:

> For the quarter ended June 30, 2004, StarTek, Inc. is pleased to report fully diluted earnings per share rose 51.7% to $0.44 compared to $0.29 for the second quarter of 2003.  For the six months ended June 30, 2004, fully diluted earnings per share increased 57.9% to $0.90 from $0.57 for the same period last year.
>
> For the three months ended June 30, 2004, gross profit increased 30.0% on a revenue increase of 17.7% over the second quarter of 2003.  The revenue increase was primarily due to continued growth in the Company's Business Process Management Services platform, both with its core telecommunications clients as well as developing clients in new industries.  The 2.5 percentage point increase in gross margin, from 23.4% to 25.9%, was primarily due to a greater proportion of the Company's revenue portfolio being generated within the higher-margin Business Process Management Services platform.  Operating margin increased 4.3 percentage points, from 10.2% to 14.5%.  Selling, general and administrative expenses remained relatively flat for the period and total operating expense as a percent of total revenue decreased by 1.9 percentage points thus increasing operating margin even more than gross margin.
>
> *   *   *
>
> In addition, the Board of Directors declared an increase in its quarterly cash dividend to $0.40 per share, payable August 24, 2004, to StarTek shareholders of record as of August 11, 2004. The dividend per share for the 2nd quarter of 2004 was $0.39, which was increased from the 1st quarter 2004 dividend of $0.38.  Revenue growth was slightly stronger in Q1 compared to Q2 due to the slower pace of wireless number porting volumes seen across the overall marketplace. In addition, the Supply Chain Management Services business continued to decline in overall volume.
>
> William E Meade, Jr., President and Chief Executive Officer said, "By leveraging our model of operational excellence, StarTek continues to be rewarded with additional business. Our clients and our shareholders benefit from our focus on customer-centric service and dedication to delivering ongoing operational efficiencies."

74.    On July 29, 2004, subsequent to the release of its quarterly results, StarTek held a conference call.  During the call, defendant Meade stated:

*We are pleased with the – we are very pleased with the very strong results of our second quarter performance. As you can see from the earnings release yesterday, our growth continues. Overall we grew revenue 18% over Q2 last year and our forward momentum on the business process management services side of our business continues. Our revenue growth demonstrates the proof of our operational excellence model and contributes to our ongoing strong EPS growth.* With this, we believe our business model continues to distinguish us. Our solid service offerings coupled with fair pricing and crisp execution continues to be able distinguish [sic] us from our competition. *Both Q2 and Q1 and Q2 combined benefited from the capacity we brought online and operationally at this tine last year*.

*During Q2, we . . . continued our successful process of ramping up slowly and deliberately two new clients, one in utilities and an addition is another key telecommunication's client.* In the quarter, porting volumes for wireless number portability were not as strong as in the previous two quarters. This trend is concurrent with that in the overall industry which has experienced lower volumes compared to an initial consumer forecast and certainly slower than wireless number portability was first introduced to consumers in November of 2003. In our supply chain management services, volume with our largest client is continuing to slow relative to the work we do for them and is trended to be a smaller and smaller percentage of our total revenue. *We continue to be encouraged by the activity in our sales pipeline. As I stated, we are currently in the middle of ramping two new clients which were secured earlier this year. We are encouraged by our recent close rates and the size of our sales pipeline. We anticipate replicating the success we had during the first half of 2004 with two new key client acquisitions during the second half of 2004, and we are very pleased with the ongoing positive response from both our existing clients and our newer clients and that they continue to reward us with more of their business. We firmly believe this is testament to the success and value of our operational excellence model.* Our focus on people and process has been the foundation of this excellence. We believe delivering servicing quality day-in and day-out is what our clients value the most, and if we do this we will be rewarded with incremental business and gain share in the marketplace.

75.     In response to a question from Lehman Brothers analyst Kristen Cooper, defendant

Meade stated:

[C]urrently we have got 20 physical locations or what we call 19 operational sites. We have a site in process right now terms of ramping [sic] which again will bring us to 20 operational sites. In the near term, we are continuing to look and have in our plans for this year having a presence offshore in Asia and having seat capacity most likely in the Philippines by year end and then again, *based on the pipeline, we could anticipate perhaps an additional facility by year end*.

76.     On October 4, 2004, the Individual Defendants caused or allowed StarTek to file an

8-K with the SEC announcing the resignation of defendant McKenzie. The 8-K stated that

McKenzie had "resigned as Executive Vice President, Chief Financial Officer, Secretary and

Treasurer for personal reasons. The Company has appointed Mr. Rodd Granger, 39, as Chief Financial Officer of the Company on an interim basis, and has commenced a search for Mr. McKenzie's permanent replacement."

77.      On November 4, 2004, the Individual Defendants caused or allowed StarTek to issue a press release entitled "StarTek, Inc. Reports Third Quarter Earnings and Raises Dividend; Board Authorizes Stock Repurchase Program Up to $25 Million," which stated in part:

> StarTek Inc. reported that fully diluted earnings per share from continuing operations decreased 21 percent for the quarter ended September 30, 2004, to $0.34 compared to $0.43 for the third quarter of 2003. Fully diluted earnings per share including discontinued operations decreased 45 percent to $0.22, compared to $0.40 for the same period in the prior year. For the nine months ended September 30, 2004, fully diluted earnings per share from continuing operations increased 24 percent to $1.29 from $1.04 for third quarter of 2003. Fully diluted earnings per share including discontinued operations increased 14 percent to $1.12 compared to $0.98 for the same period in the prior year. Discontinued operations consist of operations in the United Kingdom, which as previously reported were sold on September 30, 2004.
>
> For the quarter ended September 30, 2004, revenue increased 13.9 percent while gross profit decreased 8.0 percent over the third quarter of 2003. The revenue increase was primarily driven by the continued strong growth in business process management services. The 5.1 percentage point decrease in gross margin, from 26.5 percent to 21.4 percent, was primarily due to:
>
> –      the previously disclosed incentive tiered-price reduction with our largest client that generated increased volume at lower prices,
>
> –      investments in launching an additional facility, and
>
> –      re-deploying resources that required a one-time re-training expense to service incremental growth.
>
> Selling, general and administrative expenses decreased by 0.1 percentage point as a percent of total revenue. The dollar increase in selling, general and administrative expenses was primarily attributed to the addition of three new sites over the prior year and costs associated with Sarbanes-Oxley compliance efforts.
>
> For the nine months ended September 30, 2004, gross profit increased 23.5 percent on a revenue increase of 20.3 percent over the same period last year. The revenue increase was primarily due to the continued strong demand for our operational excellence model and the consistent delivery of service performance.
>
> *In addition, the Board of Directors declared an increase in the Company's quarterly cash dividend to $0.41 per share*, payable November 24, 2004, to StarTek shareholders of record as of November 11, 2004. The dividend per share for the 3rd

quarter of 2004 was $0.40, which was increased from the 2nd quarter 2004 dividend of $0.39.

> "*While we are disappointed with the Company's results for this quarter when compared with last year, we are confident the decisions and investments we have made in the quarter will support continued profitable growth,*" said William E. Meade Jr., President and Chief Executive Officer of StarTek.

> *StarTek also announced that the Company's Board of Directors has authorized the Company to repurchase up to $25 million of StarTek's common stock. The repurchase program is effective immediately and will remain in effect until terminated by the Board of Directors. The repurchase program will allow the company to repurchase its shares from time to time in accordance with the requirements of the Securities and Exchange Commission on the open market, in block trades and in privately-negotiated transactions, depending on market conditions and other factors. Any repurchased shares will be held as treasury stock and will be available for general corporate purposes.*

> "*We're undertaking this stock buy-back program with high confidence in our current operational performance,*" *Meade said. "Our fundamentals are strong, and our capital position affords us the opportunity to repurchase stock at an attractive market price. We see this as an excellent investment opportunity that's in the best interests of our shareholders.*"

78.     On February 18, 2005, the Individual Defendants caused or allowed StarTek to issue a press release entitled "StarTek, Inc. Announces Management Change," which stated in part:

> StarTek, Inc. reported today that William E. Meade, Jr. has resigned as President and Chief Executive Officer of the company. Mr. Meade and the company's board of directors mutually agreed that a change in leadership is in the best interests of StarTek's stockholders, and Mr. Meade has tendered his resignation to the board to pursue other interests. Mr. Meade also resigned from his position as a director on the company's board.

> The board of directors has appointed Steven D. Butler, StarTek's Executive Vice President, Chief Financial Officer, Secretary and Treasurer, as President and Chief Executive Officer on an interim basis. The board has also formed a special committee of its independent directors, chaired by Albert C. Yates, to initiate a search for a permanent Chief Executive Officer.

79.     On February 22, 2005, *Rocky Mountain News* ran an article entitled "StarTek Abruptly Ousts CEO; Drop in Stock Price, Poor Financial Results Preceded Resignation," which stated in part:

> "William Meade has been unexpectedly ousted as chief executive of StarTek Inc.

* * *

In a statement, StarTek said Meade and the board 'mutually agreed that a change in leadership is in the best interests of StarTek's stockholders.'"

80.     On March 3, 2005, the Individual Defendants caused or allowed StarTek to issue a

press release entitled "StarTek Inc. Reports 2004 Earnings," which stated in part:

StarTek Inc. reported that gross profit increased 5% on a revenue increase of 15% to $258 million for the year ended December 31, 2004 compared with $225 million for the year ended December 31, 2003. Fully diluted earnings per share from continuing operations decreased to $1.59 from $1.60 for the same periods. Fully diluted earnings per share including discontinued operations decreased 7% for 2004 to $1.42 compared to $1.52 for 2003. Discontinued operations consisted of our operations in the United Kingdom which, as previously reported, were sold on September 30, 2004.

Business process management revenues increased 34% in 2004, while supply chain management revenues declined 40% versus the previous year. Business process management revenue now comprises 86% of total revenue compared to 73% for the previous year. The StarTek Advantage System, our operational excellence model, continues to produce excellent customer satisfaction which generates growing demand for our business process management services platform.

Selling, general and administrative expenses increased by 8% for the year ended December 31, 2004 compared to the prior year. The increase is attributable to the launch and staffing of three new call centers and expenses associated with the Sarbanes-Oxley Act of 2002. As a result of the new call centers and related infrastructure, depreciation expense increased $2.5 million over the prior year or by $0.17 per share.

For the quarter ended December 31, 2004, revenue was essentially flat at $64.8 million, and fully diluted earnings per share from continuing operations decreased 46% to $0.30 compared to $0.56 for the fourth quarter of 2003. Fully diluted earnings per share including discontinued operations decreased by 44% to $0.30, compared to $0.54 for the same period in 2003. *The gross margin decline of 9.7% points from 29.7% to 20.0%, was largely the result of greater costs from the launching of new call center capacity to handle anticipated volume growth that materialized at lower levels than our clients forecasted, continuing decreases in revenue and margins in our supply chain management platform, and increased volume billed at lower agent rates due to our tiered incentive pricing model*.

Selling, general and administrative expenses decreased by 7% for the fourth quarter of 2004 compared with 2003. This reduction would have been greater but for the offset of substantially increased costs attributable to the Sarbanes-Oxley Act of 2002.

"The last two quarters have not met our expectations. Although our business process management revenue has continued to grow over the past year, our focus in

2005 will be to improve our margins and to build new sources of revenue" said Steve Butler, Chief Financial Officer and Acting Chief Executive Officer of StarTek.

81.     On March 3, 2005, subsequent to the release of its quarterly results, StarTek held a conference call for analysts, money and portfolio managers, institutional investors and large StarTek shareholders.  During the call, the following transpired:

> [STEVEN BUTLER, the Company's CFO and Acting CEO]: *We launched three new call centers in anticipation of a lot greater volume, with a couple of the clients that we signed last year.  That didn't materialize last year*, it could materialize this year in a lot greater way.  When you look at those things and you start to monitor your margins more carefully, that's what we're going to do.  We have to start to take some corrective action.  That's where we're at.

> TROY MASTIN [William Blair & Co. analyst]:  This is the #1 surprise is less volume than anticipated?

> STEVEN BUTLER:  The delivery of that volume, yes.  Yeah, our largest client, obviously, delivered greater volume.  The tiered pricing structure affected us there to some extent.  A couple of other clients didn't deliver the volume we anticipated, having excess capacity for anticipated volume that wasn't there.  So we're starting to realign the capacity with the volume.

*   *   *

> TROY MASTIN:  Okay.  *And then on the new business pipeline, there has been a lot of discussion over the last 6-9 months that it was healthy.  It's characterized as the strongest ever.  You didn't mention any new clients on the call, can you give us an update on any landed in the quarter, and what the pipeline looks [like] today in your assessment*?

> STEVEN BUTLER:  . . . We hired a new head of sales in October, who completely revamped the sales force during the course of the fourth quarter, and during the course of January.  *I cannot announce any clients today*.

*   *   *

> ARNOLD URSANER [CJS Securities analyst]:  I'll try to ask this question politely.  Your stock is down 50 percent from where you did a public offering for a selling shareholder.  The idea that you'll make no comments whatsoever about the upcoming year, I speak on behalf of a lot of people that own your stock, they're not real pleased with that.  Your margins are down 35 percent.  Your revenues are pretty disappointing.  Your SG&A expenses are declining for one-time items like audits.  The idea that you're giving no guidance at all, is pretty upsetting to your shareholders  Can you give us some of the components of the earnings?

> STEVEN BUTLER:  What I said at this point in time, we're not going to give any guidance.

- 36 -

82.     On May 6, 2005, before the markets opened, the Individual Defendants caused or allowed StarTek to issue a press release entitled "StarTek Inc. Reports First Quarter Earnings," which stated in part:

> StarTek Inc. reported fully diluted earnings per share from continuing operations decreased for the first quarter ended March 31, 2005, to $0.18 compared to $0.49 for the first quarter of 2004.
>
> For the first quarter of 2005, *revenue declined 14.2% to $54.3 million from $63.3 million for the same period in 2004*, which was primarily driven by a decline in our supply chain management services and partially due to our tiered incentive pricing model in our business process management services.  *Gross margin declined in the first quarter to 21.6% from 28.6% for the same period in 2004*. This decline was attributed to a greater portion of client volume billed at lower rates, excess call center capacity, continuing decreases in revenue and margins in our supply chain management platform, and unfavorable foreign exchange.

83.     Defendants' statements issued during the Relevant Period were improper because:

(a)     There was insufficient existing and forecasted demand to efficiently utilize StarTek's capacity which was significantly increased by the opening of six new facilities during the Relevant Period;

(b)     Defendants failed to disclose that StarTek was forced to drastically reduce its pricing in return for the contract extension with AWE;

(c)     The severe problems the Company experienced in 2000-2001 were not fixed and behind the Company and the management transition and restructuring plan was still not implemented during the Relevant Period; and

(d)     StarTek's sales pipeline was not strong and healthy and in fact things were so bad that StarTek was forced to hire another new head of sales in October 2004, who completely revamped the sales force during the course of the fourth quarter, and during the course of January 2005.

84.     As a result of the Individual Defendants' actions, StarTek's market capitalization has been damaged by over $379.2 million.  At the same time that the defendants were causing StarTek to

suffer such devastation of its market capitalization, the Insider Selling Defendants fared much better by selling over $153 million of their personally held and/or controlled stock.

## ILLEGAL INSIDER SELLING

85.    While in possession of the undisclosed material adverse information, the Insider Selling Defendants sold the following shares of StarTek stock:

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| Toni E. Stephenson | 6/15/2004 | 1813076 | $ 33.00 | $ 59,831,508.00 |
|  | 6/18/2004 | 570000 | $ 33.00 | $ 18,810,000.00 |
|  |  | **2383076** |  | **$ 78,641,508.00** |
| William E. Meade, Jr. | 9/15/2003 | 2200 | $ 35.00 | $ 77,000.00 |
|  | 9/15/2003 | 100 | $ 35.05 | $ 3,505.00 |
|  | 9/15/2003 | 100 | $ 35.00 | $ 3,500.00 |
|  | 9/17/2003 | 800 | $ 35.00 | $ 28,000.00 |
|  | 11/6/2003 | 3500 | $ 37.00 | $ 129,500.00 |
|  | 11/28/2003 | 3300 | $ 39.14 | $ 129,162.00 |
|  | 12/8/2003 | 5000 | $ 40.00 | $ 200,000.00 |
|  |  | **15000** |  | **$ 570,667.00** |
| Hank Brown | 9/2/2003 | 4500 | $ 36.13 | $ 162,589.95 |
|  | 9/3/2003 | 300 | $ 35.75 | $ 10,725.00 |
|  | 9/3/2003 | 100 | $ 35.67 | $ 3,567.00 |
|  | 9/3/2003 | 200 | $ 36.00 | $ 7,200.00 |
|  | 9/3/2003 | 4900 | $ 35.50 | $ 173,950.00 |
|  |  | **10000** |  | **$ 358,031.95** |
| Michael W. Morgan | 8/19/2003 | 100 | $ 36.49 | $ 3,649.00 |
|  | 8/19/2003 | 600 | $ 36.45 | $ 21,870.00 |
|  | 8/19/2003 | 400 | $ 36.44 | $ 14,576.00 |
|  | 8/19/2003 | 100 | $ 36.43 | $ 3,643.00 |
|  | 8/19/2003 | 3100 | $ 36.50 | $ 113,150.00 |
|  | 8/19/2003 | 900 | $ 36.47 | $ 32,823.00 |
|  | 8/19/2003 | 600 | $ 36.46 | $ 21,876.00 |
|  | 8/19/2003 | 100 | $ 36.55 | $ 3,655.00 |
|  | 8/19/2003 | 100 | $ 36.52 | $ 3,652.00 |
|  | 8/19/2003 | 700 | $ 36.51 | $ 25,557.00 |
|  | 8/19/2003 | 600 | $ 36.66 | $ 21,996.00 |
|  | 8/19/2003 | 5400 | $ 36.65 | $ 197,910.00 |
|  | 8/19/2003 | 600 | $ 36.56 | $ 21,936.00 |
|  | 8/20/2003 | 600 | $ 36.27 | $ 21,762.00 |
|  | 8/20/2003 | 1000 | $ 36.25 | $ 36,250.00 |
|  | 8/20/2003 | 800 | $ 36.26 | $ 29,008.00 |

| | | | | |
|---|---|---|---|---|
| 8/20/2003 | 700 | $ | 36.30 | $ | 25,410.00 |
| 8/20/2003 | 600 | $ | 36.29 | $ | 21,774.00 |
| 8/20/2003 | 100 | $ | 36.28 | $ | 3,628.00 |
| 8/20/2003 | 200 | $ | 36.35 | $ | 7,270.00 |
| 8/20/2003 | 400 | $ | 36.34 | $ | 14,536.00 |
| 8/20/2003 | 100 | $ | 36.31 | $ | 3,631.00 |
| 8/20/2003 | 100 | $ | 36.45 | $ | 3,645.00 |
| 8/20/2003 | 1100 | $ | 36.40 | $ | 40,040.00 |
| 8/20/2003 | 200 | $ | 36.36 | $ | 7,272.00 |
| 8/20/2003 | 200 | $ | 36.49 | $ | 7,298.00 |
| 8/21/2003 | 100 | $ | 36.61 | $ | 3,661.00 |
| 8/21/2003 | 100 | $ | 36.60 | $ | 3,660.00 |
| 8/21/2003 | 100 | $ | 36.58 | $ | 3,658.00 |
| 8/21/2003 | 600 | $ | 36.66 | $ | 21,996.00 |
| 8/21/2003 | 10400 | $ | 36.65 | $ | 381,160.00 |
| 8/21/2003 | 100 | $ | 36.63 | $ | 3,663.00 |
| 8/21/2003 | 3800 | $ | 36.70 | $ | 139,460.00 |
| 8/21/2003 | 4200 | $ | 36.68 | $ | 154,056.00 |
| 8/21/2003 | 600 | $ | 36.67 | $ | 22,002.00 |
| 8/21/2003 | 3100 | $ | 36.75 | $ | 113,925.00 |
| 8/21/2003 | 100 | $ | 36.72 | $ | 3,672.00 |
| 8/21/2003 | 400 | $ | 36.71 | $ | 14,684.00 |
| 8/21/2003 | 400 | $ | 36.80 | $ | 14,720.00 |
| 8/21/2003 | 700 | $ | 36.79 | $ | 25,753.00 |
| 8/21/2003 | 300 | $ | 36.78 | $ | 11,034.00 |
| 8/21/2003 | 200 | $ | 36.86 | $ | 7,372.00 |
| 8/21/2003 | 200 | $ | 36.84 | $ | 7,368.00 |
| 8/21/2003 | 200 | $ | 36.81 | $ | 7,362.00 |
| 8/21/2003 | 100 | $ | 36.90 | $ | 3,690.00 |
| 8/21/2003 | 200 | $ | 36.89 | $ | 7,378.00 |
| 8/21/2003 | 2000 | $ | 36.88 | $ | 73,760.00 |
| 8/21/2003 | 100 | $ | 36.95 | $ | 3,695.00 |
| 8/21/2003 | 800 | $ | 36.94 | $ | 29,552.00 |
| 8/21/2003 | 200 | $ | 36.93 | $ | 7,386.00 |
| 8/21/2003 | 100 | $ | 37.00 | $ | 3,700.00 |
| 8/21/2003 | 400 | $ | 36.99 | $ | 14,796.00 |
| 8/21/2003 | 400 | $ | 36.98 | $ | 14,792.00 |
| 8/21/2003 | 100 | $ | 37.03 | $ | 3,703.00 |
| 8/22/2003 | 200 | $ | 36.25 | $ | 7,250.00 |
| 8/22/2003 | 100 | $ | 36.40 | $ | 3,640.00 |
| 8/22/2003 | 300 | $ | 36.60 | $ | 10,980.00 |
| 8/22/2003 | 200 | $ | 36.28 | $ | 7,256.00 |
| 8/22/2003 | 400 | $ | 36.29 | $ | 14,516.00 |
| 8/26/2003 | 1300 | $ | 35.76 | $ | 46,488.00 |
| 8/26/2003 | 300 | $ | 35.85 | $ | 10,755.00 |
| 8/26/2003 | 300 | $ | 36.78 | $ | 11,034.00 |
| 8/26/2003 | 100 | $ | 37.05 | $ | 3,705.00 |
| 8/26/2003 | 4300 | $ | 36.50 | $ | 156,950.00 |

| | | | | |
|---|---|---|---|---|
| 8/26/2003 | 100 | $ | 36.68 | $ | 3,668.00 |
| 8/26/2003 | 500 | $ | 36.09 | $ | 18,045.00 |
| 8/26/2003 | 200 | $ | 35.70 | $ | 7,140.00 |
| 8/26/2003 | 300 | $ | 35.77 | $ | 10,731.00 |
| 8/26/2003 | 1400 | $ | 35.96 | $ | 50,344.00 |
| 8/26/2003 | 200 | $ | 35.98 | $ | 7,196.00 |
| 8/26/2003 | 100 | $ | 36.71 | $ | 3,671.00 |
| 8/26/2003 | 100 | $ | 36.60 | $ | 3,660.00 |
| 8/26/2003 | 400 | $ | 35.80 | $ | 14,320.00 |
| 8/26/2003 | 100 | $ | 36.76 | $ | 3,676.00 |
| 8/26/2003 | 200 | $ | 35.75 | $ | 7,150.00 |
| 8/26/2003 | 300 | $ | 36.85 | $ | 11,055.00 |
| 8/26/2003 | 1000 | $ | 36.00 | $ | 36,000.00 |
| 8/26/2003 | 100 | $ | 36.65 | $ | 3,665.00 |
| 8/26/2003 | 100 | $ | 36.70 | $ | 3,670.00 |
| 8/27/2003 | 1800 | $ | 36.40 | $ | 65,520.00 |
| 8/27/2003 | 1000 | $ | 36.25 | $ | 36,250.00 |
| 8/27/2003 | 400 | $ | 36.36 | $ | 14,544.00 |
| 8/27/2003 | 400 | $ | 36.38 | $ | 14,552.00 |
| 8/27/2003 | 200 | $ | 36.30 | $ | 7,260.00 |
| 8/27/2003 | 200 | $ | 36.39 | $ | 7,278.00 |
| 8/27/2003 | 400 | $ | 36.51 | $ | 14,604.00 |
| 8/28/2003 | 4700 | $ | 36.64 | $ | 172,208.00 |
| 8/28/2003 | 200 | $ | 36.55 | $ | 7,310.00 |
| 8/28/2003 | 100 | $ | 36.61 | $ | 3,661.00 |
| 8/28/2003 | 300 | $ | 36.54 | $ | 10,962.00 |
| 8/28/2003 | 4700 | $ | 36.56 | $ | 171,832.00 |
| 8/29/2003 | 600 | $ | 36.40 | $ | 21,840.00 |
| 8/29/2003 | 200 | $ | 36.28 | $ | 7,256.00 |
| 8/29/2003 | 100 | $ | 36.45 | $ | 3,645.00 |
| 8/29/2003 | 1700 | $ | 36.25 | $ | 61,625.00 |
| 8/29/2003 | 400 | $ | 36.35 | $ | 14,540.00 |
| 8/29/2003 | 100 | $ | 36.30 | $ | 3,630.00 |
| 8/29/2003 | 100 | $ | 36.36 | $ | 3,636.00 |
| 9/3/2003 | 200 | $ | 36.60 | $ | 7,320.00 |
| 9/3/2003 | 100 | $ | 36.45 | $ | 3,645.00 |
| 9/3/2003 | 100 | $ | 36.67 | $ | 3,667.00 |
| 9/3/2003 | 100 | $ | 36.47 | $ | 3,647.00 |
| 9/3/2003 | 200 | $ | 36.48 | $ | 7,296.00 |
| 9/3/2003 | 400 | $ | 36.52 | $ | 14,608.00 |
| 9/3/2003 | 500 | $ | 36.32 | $ | 18,160.00 |
| 9/3/2003 | 100 | $ | 36.40 | $ | 3,640.00 |
| 9/3/2003 | 400 | $ | 36.53 | $ | 14,612.00 |
| 9/3/2003 | 100 | $ | 36.42 | $ | 3,642.00 |
| 9/3/2003 | 100 | $ | 36.65 | $ | 3,665.00 |
| 9/3/2003 | 200 | $ | 36.55 | $ | 7,310.00 |
| 9/3/2003 | 100 | $ | 36.31 | $ | 3,631.00 |
| 9/3/2003 | 400 | $ | 36.57 | $ | 14,628.00 |

| | | | | | |
|---|---|---|---|---|---|
| | 3/26/2004 | 400 | $ | 34.64 | $ | 13,856.00 |
| | 3/26/2004 | 500 | $ | 34.63 | $ | 17,315.00 |
| | 3/26/2004 | 1100 | $ | 34.62 | $ | 38,082.00 |
| | 3/26/2004 | 100 | $ | 34.71 | $ | 3,471.00 |
| | 3/26/2004 | 2100 | $ | 34.70 | $ | 72,870.00 |
| | 3/26/2004 | 200 | $ | 34.69 | $ | 6,938.00 |
| | 3/26/2004 | 500 | $ | 34.80 | $ | 17,400.00 |
| | 3/26/2004 | 200 | $ | 34.77 | $ | 6,954.00 |
| | 3/26/2004 | 100 | $ | 34.76 | $ | 3,476.00 |
| | 3/29/2004 | 600 | $ | 34.65 | $ | 20,790.00 |
| | 3/29/2004 | 2600 | $ | 34.64 | $ | 90,064.00 |
| | 3/29/2004 | 51100 | $ | 34.63 | $ | 1,769,593.00 |
| | 3/29/2004 | 100 | $ | 34.89 | $ | 3,489.00 |
| | 3/29/2004 | 300 | $ | 34.87 | $ | 10,461.00 |
| | 3/29/2004 | 100 | $ | 34.71 | $ | 3,471.00 |
| | | **142600** | | | $ | **5,095,894.00** |
| | | | | | | |
| Pamela S. Oliver/ | 1/8/2004 | 2900 | $ | 41.99 | $ | 121,771.00 |
| MASSET Trust | 1/8/2004 | 1300 | $ | 41.98 | $ | 54,574.00 |
| | 1/8/2004 | 300 | $ | 41.88 | $ | 12,564.00 |
| | 1/8/2004 | 400 | $ | 41.87 | $ | 16,748.00 |
| | 1/8/2004 | 1300 | $ | 41.86 | $ | 54,418.00 |
| | 1/8/2004 | 1100 | $ | 41.91 | $ | 46,101.00 |
| | 1/8/2004 | 2300 | $ | 41.90 | $ | 96,370.00 |
| | 1/8/2004 | 700 | $ | 41.89 | $ | 29,323.00 |
| | 1/8/2004 | 100 | $ | 41.94 | $ | 4,194.00 |
| | 1/8/2004 | 1300 | $ | 41.93 | $ | 54,509.00 |
| | 1/8/2004 | 400 | $ | 41.92 | $ | 16,768.00 |
| | 1/8/2004 | 600 | $ | 41.97 | $ | 25,182.00 |
| | 1/8/2004 | 100 | $ | 41.96 | $ | 4,196.00 |
| | 1/8/2004 | 300 | $ | 41.95 | $ | 12,585.00 |
| | 1/9/2004 | 300 | $ | 41.36 | $ | 12,408.00 |
| | 1/9/2004 | 200 | $ | 41.32 | $ | 8,264.00 |
| | 1/9/2004 | 11600 | $ | 40.10 | $ | 465,160.00 |
| | 1/9/2004 | 200 | $ | 41.39 | $ | 8,278.00 |
| | 1/9/2004 | 300 | $ | 41.38 | $ | 12,414.00 |
| | 1/9/2004 | 200 | $ | 41.37 | $ | 8,274.00 |
| | 1/9/2004 | 3100 | $ | 41.40 | $ | 128,340.00 |
| | 1/9/2004 | 400 | $ | 41.56 | $ | 16,624.00 |
| | 1/9/2004 | 200 | $ | 41.49 | $ | 8,298.00 |
| | 1/9/2004 | 200 | $ | 41.43 | $ | 8,286.00 |
| | 1/9/2004 | 200 | $ | 41.79 | $ | 8,358.00 |
| | 1/9/2004 | 200 | $ | 41.78 | $ | 8,356.00 |
| | 1/9/2004 | 100 | $ | 41.58 | $ | 4,158.00 |
| | 1/9/2004 | 500 | $ | 41.85 | $ | 20,925.00 |
| | 1/9/2004 | 200 | $ | 41.81 | $ | 8,362.00 |
| | 1/9/2004 | 700 | $ | 41.80 | $ | 29,260.00 |
| | 1/9/2004 | 200 | $ | 41.95 | $ | 8,390.00 |

|  | | | | |
|---|---|---|---|---|
|  | 1/9/2004 | 800 | $ 41.92 | $ 33,536.00 |
|  | 1/9/2004 | 300 | $ 41.87 | $ 12,561.00 |
|  | 1/9/2004 | 100 | $ 41.99 | $ 4,199.00 |
|  | 1/9/2004 | 300 | $ 41.97 | $ 12,591.00 |
|  | 1/9/2004 | 400 | $ 41.96 | $ 16,784.00 |
|  | 6/15/2004 | 993462 | $ 33.00 | $ 32,784,246.00 |
|  |  | **1027262** |  | **$ 34,177,375.00** |
|  |  |  |  |  |
| Pamela S. Oliver/ | 1/6/2004 | 2000 | $ 41.84 | $ 83,680.00 |
| FASSET Trust | 1/6/2004 | 6000 | $ 41.80 | $ 250,800.00 |
|  | 1/6/2004 | 10000 | $ 41.60 | $ 416,000.00 |
|  | 1/6/2004 | 400 | $ 41.94 | $ 16,776.00 |
|  | 1/6/2004 | 100 | $ 41.90 | $ 4,190.00 |
|  | 1/6/2004 | 1000 | $ 41.85 | $ 41,850.00 |
|  | 1/6/2004 | 300 | $ 42.03 | $ 12,609.00 |
|  | 1/6/2004 | 300 | $ 42.00 | $ 12,600.00 |
|  | 1/6/2004 | 4900 | $ 41.95 | $ 205,555.00 |
|  | 1/7/2004 | 300 | $ 41.87 | $ 12,561.00 |
|  | 1/7/2004 | 1000 | $ 41.85 | $ 41,850.00 |
|  | 1/7/2004 | 500 | $ 41.80 | $ 20,900.00 |
|  | 1/7/2004 | 500 | $ 41.91 | $ 20,955.00 |
|  | 1/7/2004 | 2600 | $ 41.89 | $ 108,914.00 |
|  | 1/7/2004 | 1700 | $ 41.88 | $ 71,196.00 |
|  | 1/7/2004 | 2200 | $ 41.94 | $ 92,268.00 |
|  | 6/15/2004 | 993462 | $ 33.00 | $ 32,784,246.00 |
|  |  | **1027262** |  | **$ 34,196,950.00** |
|  |  |  |  |  |
| **Total** |  | **4605200** |  | **$153,040,425.95** |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

86.     Plaintiff brings this action derivatively in the right and for the benefit of StarTek to redress injuries suffered, and to be suffered, by StarTek as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  StarTek is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

87.     Plaintiff will adequately and fairly represent the interests of StarTek in enforcing and prosecuting its rights.

88.     Plaintiff is and was an owner of the stock of StarTek during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

89.     The following five individuals are on the current Board of Directors of StarTek: defendants Norton, Yates, Zschau and Stephenson and Steven Butler ("Butler").  Plaintiff has not made any demand on the present Board of Directors of StarTek to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons:

(a)     Defendant Stephenson is, and at all times relevant hereto, was Chairman of the Board of StarTek.  Stephenson, at one time had the control of over 66% of the Company through his holdings, and his influence over his wife's holdings (defendant T. Stephenson) and his sister's holdings (defendant Oliver) and control over the FASSET and MASSET Trusts.   During the Relevant Period, Stephenson caused the sale of over 65% of these holdings while in possession of non-public inside information.  These inside sales by Stephenson, T. Stephenson and Oliver, reaped a benefit of over $147 million dollars.  As Chairman of the Board of StarTek, Stephenson directed and benefited directly and/or indirectly by inside sales of over $147 million dollars.  Because defendant Stephenson has received a personal financial benefit from the challenged insider trading transactions, Stephenson is interested.  Also, defendant Stephenson faces a substantial threat of liability for breach of his fiduciary duties for insider selling.  Since defendant Stephenson has breached his fiduciary duties and is interested, any demand upon him is futile;

(b)     Defendant Stephenson dominates and controls each of the Individual Defendants on the Company's Board as he founded the Company and controlled through his wife and sister, defendants T. Stephenson and Oliver, respectively, 66% of the Company's outstanding common stock during the Relevant Period.  After stock sales during the Relevant Period, defendant Stephenson still controls over 22.9% ownership of StarTek common stock.  Stephenson has sole voting power over his stock holdings.  Further, defendant Stephenson, by his power and influence

over StarTek, controls the substantial compensation paid to the officers and directors who serve on the Board.  By virtue of defendant Stephenson's substantial stock holdings, his present and past positions within the Company, and his participation in the wrongdoing alleged herein, defendant Stephenson is not independent and is not disinterested and thus demand upon him would be futile.  Likewise, by virtue of this defendant's domination and control over the Company's Board, demand upon defendants Norton, Yates and Zschau and upon Butler would be futile;

(c)      According to StarTek's Proxy Statement filed with the SEC on or about May 18, 2005, defendants Zschau, Yates and Norton were, during part of the Relevant Period, members of the Audit Committee.  The Audit Committee is responsible for assisting the Board of Directors in fulfilling its responsibility relating to: (i) the Company's systems of internal accounting and financial controls; (ii) the evaluation of enterprise risk issues; and (iii) reviewing and discussing the Company's earnings press releases as well as the types of financial information periodically provided to analysts and rating agencies.  Nonetheless, the Audit Committee recommended that the Company release improper information pertaining to the Company's business prospects.  By such actions, defendants Zschau, Yates and Norton breached their duties by causing or allowing the improper statements as described above.  As a result of these defendants' breach of their duties, any demand upon them is futile;

(d)      The entire StarTek Board of Directors and senior management participated in the wrongs complained of herein.  StarTek's directors are not disinterested or independent due to the following: defendants Stephenson, Zschau, Yates and Norton served on the StarTek Board during a significant portion of the Relevant Period.  Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs.  Each of the above referenced defendants breached the fiduciary duties that they owed to StarTek and its shareholders in that they failed to prevent and correct the dissemination of improper financial information relating to future business prospects.  Thus, the StarTek Board cannot exercise

independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected StarTek to millions of dollars in liability for possible violations of applicable securities laws;

(e)     The Individual Defendants, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein.  In addition to the conflicts that exist as a result of their participation in the improper statements regarding financial prospects, as detailed herein *supra*, the majority of the Board, including the defendants listed below, are subject to the following prejudicial entanglements:

(i)     ***Norton and Brown Are Long Time Business Associates***:

Norton served as the President of the University of Northern Colorado ("UNC") from 2003 to the present, after a term as Vice President for University Affairs and General Counsel.  Norton was a trustee of the University from 1995 to 1998.  Norton recruited Brown to UNC when she was a trustee.  Brown was president of UNC from 1998 to 2002. Norton replaced Brown, who now heads the University of Colorado, since April 2005.  Because of their long-standing business and professional relationships, defendant Norton will not take the action requested herein against defendant Brown or the remainder of the Individual Defendants.

(ii)     ***Zschau and Brown Are Long Time Acquaintances***:

Zschau was elected in 1982 to the U.S. House of Representatives and represented the Silicon Valley area in Congress for two terms ending in 1986.  Brown was a United States Senator from 1990 to 1996 and served in the United States Congress, U.S. House of Representatives, for five consecutive terms from 1980 through 1990. Because of their long-standing business and professional relationships, defendant Zschau will not take the action requested herein against defendant Brown or the remainder of the Individual Defendants.

(f)     The Director Defendants of StarTek, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from StarTek's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

(g)       In order to bring this suit, all of the directors of StarTek would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

(h)       The acts complained of constitute violations of the fiduciary duties owed by StarTek's officers and directors and these acts are incapable of ratification;

(i)       Each of the defendant directors of StarTek authorized and/or permitted the improper statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various improper statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

(j)       Any suit by the current directors of StarTek to remedy these wrongs would likely expose the Individual Defendants and StarTek to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

(k)       StarTek has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for StarTek any part of the damages StarTek suffered and will suffer thereby;

(l)       If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants.  In essence, they would be forced to take positions contrary to the defenses

they will likely assert in the securities class actions.  This they will not do.  Thus, demand is futile; and

(m)      If StarTek's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of StarTek.  However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by StarTek against these defendants, known as, *inter alia*, the "insured versus insured exclusion."  As a result, if these directors were to sue themselves or certain of the officers of StarTek, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  If there is no directors' and officers' liability insurance at all then the current directors will not cause StarTek to sue them, since they will face a large uninsured liability.

90.      Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board of Directors has failed and refused to seek to recover for StarTek for any of the wrongdoing alleged by plaintiff herein.

91.      Plaintiff has not made any demand on shareholders of StarTek to institute this action since such demand would be a futile and useless act for the following reasons:

(a)      StarTek is a publicly held company with over 14 million shares outstanding, and thousands of shareholders;

(b)      Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)     Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

92.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

93.     At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold StarTek common stock on the basis of such information.

94.     Defendants T. Stephenson and Oliver, while in possession of the material non-public information described above, aided and abetted defendant Stephenson's breach of fiduciary duties, and benefited from the sale of StarTek common stock on the basis of such information.

95.     The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold StarTek common stock.

96.     At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated.  The Insider Selling Defendants' sales of StarTek common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

97.     Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT II

### Against All Defendants for Breach of Fiduciary Duty

98.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

99.     The Individual Defendants owed and owe StarTek fiduciary obligations.  By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe StarTek the highest obligation of good faith, fair dealing, loyalty and due care.

100.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

101.     Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent financial prospects of the Company.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

102.     Defendants T. Stephenson and Oliver, aided and abetted the other Individual Defendants' breach of fiduciary duties, and benefited therefrom.

103.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, StarTek has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

104.     Plaintiff on behalf of StarTek has no adequate remedy at law.

## COUNT III

### Against All Defendants for Abuse of Control

105.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

106.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence StarTek, for which they are legally responsible.

107. As a direct and proximate result of the Individual Defendants' abuse of control, StarTek has sustained significant damages.

108. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

109. Plaintiff on behalf of StarTek has no adequate remedy at law.

## COUNT IV

### Against All Defendants for Gross Mismanagement

110. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

111. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of StarTek in a manner consistent with the operations of a publicly held corporation.

112. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, StarTek has sustained significant damages in excess of hundreds of millions of dollars.

113. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

114. Plaintiff on behalf of StarTek has no adequate remedy at law.

## COUNT V

### Against All Defendants for Waste of Corporate Assets

115. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

116. As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision,

defendants have caused StarTek to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

117.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

118.    Plaintiff on behalf of StarTek has no adequate remedy at law.

## COUNT VI

### Against All Defendants for Unjust Enrichment

119.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

120.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of StarTek.

121.    Plaintiff, as a shareholder and representative of StarTek, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.    Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of StarTek has an effective remedy;

C.      Awarding to StarTek restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

D.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

THE LAW OFFICES OF F. JAMES
DONNELLY, P.C

DATED: November 18, 2005


 *s/ F. James Donnelly*
F. JAMES DONNELLY

6076 South Chester Way
Greenwood Village, CO 80111
Telephone: 720/493-9814
Facsimile:  720/493-9815

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
MARC M. UMEDA
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: 619/525-3990
Facsimile:  619/525-3991

Attorneys for Plaintiff


Address of Plaintiff:

1531 Northeast 88th St.
Seattle, King County, WA  98115